AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Columbia

In the Matter of the Search of

*(Briefly describe the property to be searched*
*or identify the person by name and address)*
THE MONITORING OF GLOBAL POSITIONING SYSTEM
INFORMATION AND CELL SITE LOCATION DATA FOR
ONE AT&T  CELL PHONE AND SEARCH OF INFORMATION
ASSOCIATED WITH THE SAME NUMBER IN VIOLATION
OF 18 U.S.C. § 2101

)
)
)
)
)
)
)

Case No. 21-sc-352

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, hereby incorporated by reference.

located in the _____Southern_____ District of _____Florida_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference.

The basis for this search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1512(c)(2); 18 U.S.C. § 2101; 18 U.S.C. § 231; 18 U.S. Code § 1752(a); 40 U.S. Code § 5104 | (obstruction of Congress); (Riots); (Civil disorder); (Unlawful Entry-Restricted Building or Grounds); (Injuries to property, weapons and violent entry/disorderly conduct on Capitol Grounds) |

The application is based on these facts:

See attached affidavit.

☐ Continued on the attached sheet.

☑ Delayed notice of __30__ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Sean P. O'Rourke, Special Agent-FBI
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____Telephone_____ *(specify reliable electronic means).*

Date:  __01/30/2021__

_____
*Judge's signature*

City and state:  __Washington, DC__

G. Michael Harvey, United States Magistrate Judge
_____
*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means

☐ Original       ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

### for the

District of Columbia

In the Matter of the Search of
*(Briefly describe the property to be searched*
*or identify the person by name and address)*
THE MONITORING OF GLOBAL POSITIONING SYSTEM
INFORMATION AND CELL SITE LOCATION DATA FOR
ONE AT&T  CELL PHONE AND SEARCH OF INFORMATION
ASSOCIATED WITH THE SAME NUMBER IN VIOLATION
OF 18 U.S.C. § 2101

)
)
)
)
)
)
)

Case No.  21-sc-352

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ Southern _____ District of _____ Florida _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A, hereby incorporated by reference.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference.

**YOU ARE COMMANDED** to execute this warrant on or before _____ February 9, 2021 _____ *(not to exceed 14 days)*

☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to G. Michael Harvey, United States Magistrate Judge .
*(United States Magistrate Judge)*

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☑ for  30  days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   01/30/2021_____

_____
*Judge's signature*

City and state:      Washington, DC_____

G. Michael Harvey, U.S. Magistrate Judge
*Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br> 21-sc-352 | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A-1

### Property to Be Searched

1.      This warrant applies to records and information associated with the cellular

device assigned to call number (240) 426-4569 ("TARGET PHONE NUMBER") whose service

provider is AT&T ("PROVIDER"), a wireless communications service provider that is located at

11760 United States Highway 1,  Suite 600, North Palm Beach, Florida 33408.

2.      Information about the location of the TARGET PHONE NUMBER that is within

the possession, custody, or control of PROVIDER, including information about the location of

the cellular telephone if it is subsequently assigned a different number.

## **ATTACHMENT A-2**

1.      The subject of this investigation is Elias Costianes.

## ATTACHMENT B-1

### I.     Information to Be Disclosed by Provider

All information about the location of the TARGET PHONE NUMBER described in Attachment A-1 for a period of 30 days, during all times day or night.  "Information about the location of the target telephone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A-1.  It further includes:

- Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

- Source and destination telephone numbers;

- Date, time, and duration of communication; and

- All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the TARGET PHONE will connect at the beginning and end of each communication, as well as per-call measurements data (also known as PCMD, RTT, NELOSE, TrueCall or similar).

It also includes monitoring non-content signaling and routing information, including all non-content packet switched data, through the installation and use of a pen register and trap and trace device pursuant to 18 U.S.C § 3123 by the service provider and the Federal Bureau of Investigation.  The pen register / trap and trace device shall be transferable to any change dialed number subsequently assigned to a device bearing the same ESN, IMSI or SIM as the target cell phone; any changed ESN, IMSI or SIM subsequently assigned the same dialed number as the target

3

cell phone; or any additional changed dialed number, ESN, IMSI or SIM listed to the same subscriber account as the target cell phone.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of PROVIDER, PROVIDER is required to disclose the Location Information to the government.  In addition, PROVIDER must furnish the government all information, facility, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with PROVIDER's services, including by initiating a signal to determine the location of the target telephone on PROVIDER's network or with such other reference points as may be reasonably available and at such intervals and times directed by the government.  The government shall compensate PROVIDER for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property.  In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information.  *See* 18 U.S.C. § 3103a(b)(2).

## II.     Government procedures for warrant execution

The United States government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section I. That information that is within the scope of Section I may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section I and will not further review the information absent an

order of the Court. Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

**Attachment B-2**

**Particular Things to be Seized**

I.     **Government procedures for warrant execution**

To the extent that the information described in Attachment A-1 is within the possession, custody, or control of the PROVIDER, including any information that has been deleted but is still available to the PROVIDER or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the PROVIDER is required to disclose to the government the following information pertaining to the Account/TARGET PHONE NUMBER listed in Attachment A-1:

a.   The following information about the customers or subscribers associated with the TARGET PHONE NUMBER/Account for the time period **November 3, 2020, through January 27, 2021**.

i.   Names (including subscriber names, user names, and screen names);

ii.   Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

iii.   Local and long distance telephone connection records;

iv.   Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

v.   Length of service (including start date) and types of service utilized;

vi.   Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii.   Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii.   Means and source of payment for such service (including any credit card or bank account number) and billing records, and

ix.   All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the TARGET PHONE NUMBER/Account, including:

    A.   the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

    B.   information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received.

    C.   all available per-call measurement data and all available NELOS reports.

## II.   Information to be Seized by the Government

All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violations of 18 U.S.C. § 1512(c)(2) (obstruction of Congress), 18 U.S.C. § 2101 (riots), 18 U.S.C. § 231 (civil disorder), 18 U.S.C. § 1752(a) (Unlawful Entry-Restricted Building or Grounds) and 40 U.S.C. § 5104 (Injuries to Property, weapons and violent entry/disorderly conduct on Capitol Grounds) involving the user of the TARGET CELL PHONE during the period **November 3, 2021, through January 27, 2021**.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section I and will not further review the information absent an order of the Court. Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

## <u>CERTIFICATE OF AUTHENTICITY OF DOMESTIC<br>RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE<br>902(11) AND 902(13)</u>

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by AT&T, and my title is

_____.  I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of AT&T.  The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**.  I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of AT&T, and they were made by AT&T as a regular practice; and

b.      such records were generated by AT&T's electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of AT&T, in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by AT&T, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____        _____
Date                                      Signature

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF THE MONITORING OF GLOBAL POSITIONING SYSTEM INFORMATION AND CELL SITE LOCATION DATA FOR ONE AT&T CELL PHONE AND SEARCH OF INFORMATION ASSOCIATED WITH THE SAME NUMBER IN VIOLATION OF 18 U.S.C. § 2101** | **Case No.     21-sc-352** <br><br> **Filed Under Seal** |

*Reference:       USAO Ref. #2021R00507; Subject Account(s): (240) 426-4569*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Special Agent Sean P. O'Rourke, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.        I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41, 18 U.S.C. §§ 2703(a), and 2703(c)(1)(A), and former Chief Judge Hogan's Memorandum Opinion in In the Matter of the Application of the United States for an Order Authorizing the Monitoring of Geolocation and Cell Site Data for a Sprint Spectrum Cell Phone Number ESN, 2006 WL 6217584 at *4 (D.D.C. 2006) (Hogan, C.J.) ("Hogan Opinion"), for information about 1) the prospective location of the cellular telephone assigned call number (240) 426-4569 (hereinafter referred to as the "TARGET PHONE NUMBER"), as detailed in Attachment B-1; and 2) historic location data for the TARGET PHONE NUMBER, as detailed in Attachment B-2[1], whose service provider is AT&T

---

[1] Upon receipt of the information described in Section I of Attachment B-2, government-authorized persons will review the information to locate items described in Section II of Attachment B-2.

("PROVIDER"), a wireless telephone service provider headquartered at 11760 United States Highway 1,  Suite 600, North Palm Beach, Florida 33408.  As a provider of wireless communications service, PROVIDER is a provider of an electronic communications service, as defined in 18 U.S.C. § 2510(15).

2.      Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act.  See 18 U.S.C. §§ 3121-3127.  The requested warrant therefore includes all the information required to be included in an order pursuant to that statute.  See 18 U.S.C. § 3123(b)(1).  A certification by Assistant United States Attorney John W. Borchert, an attorney for the government, that the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by the Federal Bureau of Investigation, is included on the signature page of this affidavit.

3.      I am "an investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.  I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been since May 13, 2018.  I attended New Agent training at the FBI Academy in Quantico, Virginia. I am currently assigned to the Joint Terrorism Task Force (JTTF) in the FBI Baltimore Division where my duties include investigating both international and domestic terrorism which typically involve violations of Title 18 of the United States Code. Prior to joining the FBI, I served nine (9) years with the City of Norfolk Police Department in Norfolk, Virginia as a police officer, detective and Task Force Officer with the FBI's Violent Crime Task

Force. I have prepared multiple search warrant applications, conducted, or participated in physical and electronic surveillance, assisted in the execution of search warrants, debriefed informants and reviewed other pertinent records. Through my training, knowledge, and experience, I have understood the significance of reviewing historical and prospective cell-site records as they relate to the location of suspects during the commission of crimes. Moreover, I have participated in federal, state, and local investigations of criminal enterprises engaged in violation ranging from trafficking firearms and illegal controlled substances to those committing complex financial fraud in which the subjects of those investigations utilized cellular phones to further their criminal activity.

4.      I base the facts set forth in this affidavit upon my personal knowledge, information obtained during my participation in this investigation, review of documents to include business and bank records and official government records, knowledge obtained from other individuals including law enforcement personnel, and communications with others who have personal knowledge of the events and circumstances described herein.  Because this affidavit is being submitted for the limited purpose of enabling this Court to make a judicial determination of probable cause to issue a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish the legal basis for the issuance of a search warrant.

5.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1512(c)(2) (obstruction of Congress), 18 U.S.C. § 2101 (Riots), 18 U.S.C. § 231 (Civil disorder), 18 U.S. Code § 1752(a) (Unlawful Entry-Restricted Building or Grounds) and 40 U.S. Code § 5104 (Injuries to property, weapons and violent entry/disorderly conduct on Capitol Grounds) have been committed Elias Costianes and others.  There is also probable cause

to believe that the historical location information, as described in Attachment B-2, and that the prospective location information, as described in Attachment B-1, will constitute evidence of these criminal violations, and will lead to the identification of individuals who are engaged in the commission of these offenses or evidence of the commission of these offenses.  Moreover, the prospective location information described in Attachment B-1 will provide evidence of where the phone is currently located, and there is probable cause to believe the phone is an instrumentality of the offenses described herein.

6.     The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711.  Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated; *see* 18 U.S.C. § 2711(3)(A)(i). As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, DC.  *See* 18 U.S.C. § 3237.

## PROBABLE CAUSE

### *Background – The U.S. Capitol on January 6, 2021*

7.     USCP, the FBI, and assisting law enforcement agencies are investigating a riot and related offenses that occurred at the United States Capitol Building, located at 1 First Street, NW, Washington, D.C., 20510 at latitude 38.88997 and longitude -77.00906 on January 6, 2021.

8.     At the U.S. Capitol, the building itself has 540 rooms covering 175,170 square feet of ground, roughly four acres.  The building is 751 feet long (roughly 228 meters) from north to south and 350 feet wide (106 meters) at its widest point.  The U.S. Capitol Visitor Center is 580,000 square feet and is located underground on the east side of the Capitol.  On the west side of the Capitol building is the West Front, which includes the inaugural stage scaffolding, a variety of open concrete spaces, a fountain surrounded by a walkway, two broad staircases, and multiple

4

terraces at each floor.  On the East Front are three staircases, porticos on both the House and Senate side, and two large skylights into the Visitor's Center surrounded by a concrete parkway.  All of this area was barricaded and off limits to the public on January 6, 2021.

9.      The U.S. Capitol is secured 24 hours a day by USCP.  Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by USCP.  Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

10.     On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

11.     On January 6, 2021, a joint session of the United States Congress convened at the U.S. Capitol.   During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the U.S. Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which took place on November 3, 2020 ("Certification").  The joint session began at approximately 1:00 p.m. Eastern Standard Time (EST).  Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection.  Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

12.     As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol.  As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and USCP were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

13.     At around 1:00 p.m. EST, known and unknown individuals broke through the police lines, toppled the outside barricades protecting the U.S. Capitol, and pushed past USCP and supporting law enforcement officers there to protect the U.S. Capitol.

14.     At around 1:30 p.m. EST, USCP ordered Congressional staff to evacuate the House Cannon Office Building and the Library of Congress James Madison Memorial Building in part because of a suspicious package found nearby.  Pipe bombs were later found near both the Democratic National Committee and Republican National Committee headquarters.

15.     Media reporting showed a group of individuals outside of the Capitol chanting, "Hang Mike Pence."  I know from this investigation that some individuals believed that Vice President Pence possessed the ability to prevent the certification of the presidential election and that his failure to do so made him a traitor.

16.     At approximately 2:00 p.m., some people in the crowd forced their way through, up, and over the barricades and law enforcement.  The crowd advanced to the exterior façade of the building.  The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials.  At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured.  Members of law enforcement attempted to maintain order and keep the crowd from entering the Capitol.

17.     Shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts.  Publicly available video footage shows an unknown

individual saying to a crowd outside the Capitol building, "We're gonna fucking take this," which your affiant believes was a reference to "taking" the U.S. Capitol.



18.     Shortly thereafter, at approximately 2:20 p.m. members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers.  That is, at or about this time, USCP ordered all nearby staff, Senators, and reporters into the Senate chamber and locked it down. USCP ordered a similar lockdown in the House chamber.  As the subjects attempted to break into the House chamber, by breaking the windows on the chamber door, law enforcement were forced to draw their weapons to protect the victims sheltering inside.

19.     At approximately 2:30 p.m. EST, known and unknown subjects broke windows and pushed past USCP and supporting law enforcement officers forcing their way into the U.S. Capitol on both the west side and the east side of the building.  Once inside, the subjects broke windows and doors, destroyed property, stole property, and assaulted federal police officers.  Many of the

federal police officers were injured, several were admitted to the hospital, and at least one federal police officer died as a result of the injuries he sustained.  .  The subjects also confronted and terrorized members of Congress, Congressional staff, and the media.  The subjects carried weapons including tire irons, sledgehammers, bear spray, and Tasers.  They also took police equipment from overrun police including shields and police batons.  At least one of the subjects carried a handgun with an extended magazine.  These actions by the unknown individuals resulted in the disruption and ultimate delay of the vote Certification.

20.    Also at approximately 2:30 p.m. EST, USCP ordered the evacuation of lawmakers, Vice President Mike Pence, and president pro tempore of the Senate, Charles Grassley, for their safety.

21.    At around 2:45 p.m. EST, subjects broke into the office of House Speaker Nancy Pelosi.

22.    At around 2:47 p.m., subjects broke into the United States Senate Chamber. Publicly available video shows an individual asking, "Where are they?" as they opened up the door to the Senate Chamber.  Based upon the context, law enforcement believes that the word "they" is in reference to members of Congress.



23.     After subjects forced entry into the Senate Chamber, publicly available video shows that an individual asked, "Where the fuck is Nancy?"  Based upon other comments and the context, law enforcement believes that the "Nancy" being referenced was the Speaker of the House of Representatives, Nancy Pelosi.



24. An unknown subject left a note on the podium on the floor of the Senate Chamber. This note, captured by the filming reporter, stated "A Matter of Time Justice is Coming."



25. During the time when the subjects were inside the Capitol building, multiple subjects were observed inside the US Capitol wearing what appears to be, based upon my training and experience, tactical vests and carrying flex cuffs. Based upon my knowledge, training, and experience, I know that flex cuffs are a manner of restraint that are designed to be carried in situations where a large number of individuals were expected to be taken into custody.





26.     At around 2:48 p.m. EST, DC Mayor Muriel Bowser announced a citywide curfew beginning at 6:00 p.m.

27.     At around 2:45 p.m. EST, one subject was shot and killed while attempting to break into the House chamber through the broken windows.

28.     At about 3:25 p.m. EST, law enforcement officers cleared the Senate floor.

29.     Between 3:25 and around 6:30 p.m. EST, law enforcement was able to clear the U.S. Capitol of all of the subjects.

30.     Based on these events, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. the same day.  In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured.  The proceedings resumed at approximately 8:00 pm after the building had been secured.  Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

31.     Beginning around 8:00 p.m., the Senate resumed work on the Certification.

32.     Beginning around 9:00 p.m., the House resumed work on the Certification.

33.     Both chambers of Congress met and worked on the Certification within the Capitol building until approximately 3 a.m. on January 7, 2021.

34.     During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

35.     Based on my training and experience, I know that it is common for individuals to carry and use their cell phones during large gatherings, such as the gathering that occurred in the area of the U.S. Capitol on January 6, 2021.  Such phones are typically carried at such gatherings to allow individuals to capture photographs and video footage of the gatherings, to communicate with other individuals about the gatherings, to coordinate with other participants at the gatherings, and to post on social media and digital forums about the gatherings.

36.     Many subjects seen on news footage in the area of the U.S. Capitol are using a cell phone in some capacity.  It appears some subjects were recording the events occurring in and around the U.S. Capitol and others appear to be taking photos, to include photos and video of themselves after breaking into the U.S. Capitol itself, including photos of themselves damaging and stealing property.  As reported in the news media, others inside and immediately outside the U.S. Capitol live-streamed their activities, including those described above as well as statements about these activities.

37.     Photos below, available on various publicly available news, social media, and other media show some of the subjects within the U.S. Capitol during the riot.  In several of these photos, the individuals who broke into the U.S. Capitol can be seen holding and using cell phones, including to take pictures and/or videos:





[2] https://losangeles.cbslocal.com/2021/01/06/congresswoman-capitol-building-takeover-an-attempted-coup/

[3] https://www.businessinsider.com/republicans-objecting-to-electoral-votes-in-congress-live-updates-2021-1.



***Facts Specific to This Application***

38.     ELIAS COSTIANES is a resident of Nottingham, Maryland. According to

Maryland Motor Vehicle Administration, ("MVA") records, CLEAR database records, and

ACCURINT database records, COSTIANES resides at the 37 Open Gate Court, Nottingham,

Maryland, and operates a 2019 Mercedes Benz Sport Utility Vehicle bearing Maryland tag

53008CJ ("SUBJECT VEHICLE"), which is registered to that address. MVA, CLEAR and

ACCURINT databases also listed the TARGET PHONE NUMBER as the most recent telephone

number for COSTIANES.

39.     On January 18, 2021, the Federal Bureau of Investigation, Baltimore Division, was

contacted by a complainant (hereinafter to be referred to as "C-1"), via telephone who provided

information that someone known to them as ELIAS COSTIANES participated in the breach of the

United States Capitol that occurred on January 6, 2021.  At the time of complaint, C-1 provided a

---

[4]https://www.thv11.com/article/news/arkansas-man-storms-capitol-pelosi/91-41abde60-a390-4a9e-b5f3-
d80b0b96141e

username of *eliaswv78* for COSTIANES's Snap Chat account which they stated contained posts of two "live" videos from a device believed to be associated with the TARGET PHONE NUMBER,  that were uploaded to the internet via the Snap Chat Social Media platform on January 6, 2021.

40.     On January 19, 2021, C-1 contacted the FBI a second time via email and provided two links via a Microsoft Share-point site which contained two MP4 video files labeled VID-202110118-WA0004 and VID-20210118-WA0005, which are further described below in *Table #1*. Those videos were then saved to a compact disc and a preliminary analysis was performed of the footage, which is further described below. C-1 also provided the TARGET TELELPHONE NUMBER as the most recent contact telephone number for COSTIANES and stated that they had known him for the last ten (10) years.

41.     On January 22, 2021, C-1 was re-interviewed by law enforcement agents assigned to this investigation. During that interview, C-1 identified COSTIANES as the person to whom the Snap Chat account *eliaswv78* belongs, and identified him as the person who appears at the 00:02 second mark wearing a blue, beanie style hat bearing #45 and the name "Trump" in VID-202110118-WA0004. A still photograph of that video is available below and is labeled "Beginning of Video." Additionally, C-1 stated that they have been to COSTIANES's residence several times for social gatherings and were aware of the existence of COSTIANES's social media accounts at the time of reporting. C-1 then willingly provided them to the FBI as well as the proceeding videos. For the clarity of this warrant, the videos will be referred to as follows:

*Table #1:*

| Video Number | "Live" Video File ID | Approximate Time Posted | Apparent Location |
|---|---|---|---|
| **"Live Video 1"** | VID-20210118-WA0004 | 2021-01-06 Beginning at 10:18 AM[5] | Outside and Inside of the Capitol Building |
| **"Live Video 2"** | VID-20210118-WA0005 | No time stamp visible | Outside and Inside of the Capitol Building |

42.     In **Live Video 1**, initially shot from outside the Capitol building, COSTIANES turns the camera towards his face at approximately the 00:02 minute mark[6]. Based on a preliminary comparison between COSTIANES's drivers' license photo from records mentioned above, and the still images captured from **Live Video-1** as further referenced below, I believe that COSTIANES was operating the device that captured the events detailed in this affidavit.

---

[5] This time stamp appears to have been inserted by Snapchat and/or the user, and might not reflect the time of events depicted in the video.

[6] The minute marks mentioned throughout this affidavit refer to the minute marks of the video provided by C-1 only. They do not reflect the actual time of the occurrences described, but rather, are a reference to events depicted in time as it related to the total duration of Video-1 and Video-2; which as previously mentioned are compilations of smaller video recordings.



| Beginning of video | COSTIANES MVA Photo | End of Live Video-1 |

43.     At the 01:14 minute mark, COSTIANES is heard saying, "*Yes, mission accomplished traitor!*" as he ascends the stairs of the Capitol.

44.     At the 00:50 minute mark, COSTIANES is filming the interior of the Capitol.

45.     At the 01:11 minute mark, the interior of the Capitol, specifically the area in and around the Rotunda is visible and the chants of "*Nancy*" and "*Speaker of the House*" can be heard.

46.     At the 02:35 minute mark, COSTIANES is heard yelling "*Open those fucking doors!*" as he films other participants engaging members of the United States Capitol Police Department. Rioters outside can be seen trying to enter the Capitol Building via exterior doors while COSTIANES keeps the camera focused on those doors while shouting "*Let's Goooo!*" and "*Yeah!*"

47.     At the 03:19 minute mark, COSTIANES is filming from a staircase running parallel to the exterior doors. At this point in the video, the doors have been opened and other participants are entering the Capitol building. As one of the exterior doors is closed, COSTIANES then yells "*Push em back open!*"

18

48.     At the 05:01 minute mark, COSTIANES is filming the interior of an elevator with several other people. He then makes the statement, "*Commandeered the 'Senators Only' Elevator...*" His hand is then visible pushing a button located on the wall of the elevator.

49.     At the 05:07 minute mark, COSTIANES is filming the interior of the House Chambers from the balcony level while exclaiming, "*Oh my God... No, don't take their stuff!*"

50.     At the 05:42 minute mark, COSTIANES states, "*What the Fuck? I guess when you ride the Senator's elevator...*"

51.     At the 06:10 minute mark, COSTIANES pans the camera towards his face. There is a banner across the screen that reads "JW Marriot, Grand Ballroom, Washington, D.C."

52.     **Live Video 1** ends at the 06:12 minute mark.

53.     **Live Video 2** begins with a recording of the grounds outside of the Capitol. At the 03:22 minute mark, COSTIANES has reached the scaffolding outside of the Capitol building and appears to be climbing through it yelling "*Let's go!*"

54.     At the 04:10 minute mark, COSTIANES is ascending the stairs outside of the Capitol shouting "*Yes!*"

55.     At the 05:12 minute mark, COSTIANES can be heard saying "*We're goin in!*"  with a vantage point of just outside of the Capitol doors.

56.     At the 05:25 minute mark, COSTIANES is inside of the Capitol.

57.     At the 10:57 minute mark, COSTIANES is heard yelling "*Open the fucking door!*"

58.     **Live Video 2** ends at the 11:43 minute mark.

59.     Based on the evidence above, I respectfully submit that COSTIANES is in control of the phone with the TARGET PHONE NUMBER, and keeps the phone with the TARGET

PHONE NUMBER readily accessible, including at his residence, on his person, and in his automobile.



COSTIANES's Mercedes Benz parked in front of 37 Open Gate Court, Nottingham, Maryland, as of January 20, 2021.

60.     The video images depicted in **Live Video 1** and **Live Video 2** bear a moniker of "elias" in the upper-left corner. Based on my training, knowledge and experience, I know that the social media platform Snap Chat places the username or an abbreviated version of their username within the videos that are produced in order to allow the creator of the video to identify themselves to other users of Snap Chat. Additionally, I know that the Snap Chat platform uses location data in order to produce a banner that allows other users to see where the primary user is located.  An example of this feature is described above.

61.     As described above, there is evidence that COSTIANES had in his possession a digital device while at the U.S. Capitol on January 6, 2021.  In addition, based on photos and videos of the offenses that date, numerous persons committing the Target Offenses possessed digital devices that they used to record and post photos and videos of themselves and others committing those offenses.  Further, based on the investigation, numerous persons committing the Target Offenses possessed digital devices to communicate with other individuals to plan their attendance at the gatherings, to coordinate with other participants at the gatherings, and to post

on social media and digital forums about the gatherings.  Based on the government's

investigation to date, the planning and coordination of these events could have begun as early as

the election on November 3.  Historical location information may provide evidence of whether

COSTIANES was located in Washington, D.C., and near the Capitol prior to January 6.  The

government has also obtained toll records for this phone which reveal calls between

COSTIANES and another unidentified subject while COSTIANES was inside the Capitol at the

time of the incursion.  Prospective location information will reveal the location of the phone

itself, which as explained above, may contain additional evidence of criminal activity.


**BACKGROUND ON CELL-SITE DATA AND LOCATION INFORMATION**

62.     In my training and experience, I have learned that PROVIDER is a company that

provides cellular telephone access to the general public.  I also know that providers of cellular

telephone service have technical capabilities that allow them to collect and generate information

about the locations of the cellular telephones to which they provide service, including: (1) E-911

Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also

known as "tower/face information" or "cell tower/sector records."   E-911 Phase II data provides

relatively precise location information about the cellular telephone itself, either via GPS tracking

technology built into the phone or by triangulating on the device's signal using data from several

of the provider's cell towers.  Cell-site data identifies the "cell towers" (i.e., antenna towers

covering specific geographic areas) that received a radio signal from the cellular telephone and,

in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected.  These

towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles

apart in rural areas.  Furthermore, the tower closest to a wireless device does not necessarily

serve every call made to or from that device.  Accordingly, cell-site data is typically less precise that E-911 Phase II data.

63.     Based on my training and experience, I know that PROVIDER can collect E-911 Phase II data about the location of the Target Cell Phone, including by initiating a signal to determine the location of the Target Cell Phone on PROVIDER's network or with such other reference points as may be reasonably available.

64.     Based on my training and experience, I know that PROVIDER can collect cell-site data about the Target Cell Phone.  Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication.  I also know that wireless providers such as PROVIDER typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

65.     Based on my training and experience, I know that AT&T also collects additional estimated location information commonly referred to as NELOS. NELOS information can provide an approximate location of the cellular device utilizing a combination of timing advance, Wi-Fi and global positioning information (GPS).  At times, this information can supplement cell site data when no call or text information is available.

66.     Based on my training and experience, I know that each cellular device has one or more unique identifiers embedded inside it.  Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms,

including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number

("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a

Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International

Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI").

The unique identifiers – as transmitted from a cellular device to a cellular antenna or tower – can

be recorded by pen-trap devices and indicate the identity of the cellular device making the

communication without revealing the communication's content.

67.     Based on my training and experience, I know that wireless providers such as

PROVIDER typically collect and retain information about their subscribers in their normal

course of business.  This information can include basic personal information about the

subscriber, such as name and address, and the method(s) of payment (such as credit card account

number) provided by the subscriber to pay for wireless communication service.  I also know that

wireless providers such as PROVIDER typically collect and retain information about their

subscribers' use of the wireless service, such as records about calls or other communications sent

or received by a particular device and other transactional records, in their normal course of

business.  In my training and experience, this information may constitute evidence of the crimes

under investigation because the information can be used to identify the TARGET PHONE

NUMBER's user or users.

68.     FBI's Cellular Analysis Survey Team (CAST) informed me that it is often

beneficial to review at least 60 days of call detail records because they will establish a pattern of

life and behavior. A smaller collection of records would make it difficult to determine if it is

unusual for the phone(s) to appear in the areas where these crime(s) occurred.  Not only will this

assist in determining if the phone(s) frequents the areas of the crime scene(s), but also whether

the phone normally belongs in these areas because that is where the phone subscriber lives and/or works.

## AUTHORIZATION REQUEST

69.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

70.     The proposed warrant will also function as a pen register order under 18 U.S.C. § 3123 authorizing the installation and use of a pen register and/or trap and trace device to record, decode, and/or capture certain information in Attachment A-1 for each communication to or from the TARGET PHONE NUMBER, without geographic limit, for a period of thirty (30) days pursuant to 18 U.S.C. § 3123(c)(1).

71.     I further request that the Court direct PROVIDER to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.  I also request that the Court direct PROVIDER to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information unobtrusively and with a minimum of interference with PROVIDER's services, including by initiating a signal to determine the location of the Target Telephone on PROVIDER's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.  The government shall reasonably compensate PROVIDER for reasonable expenses incurred in furnishing such facilities or assistance.

72.     Because the warrant will be served on PROVIDER, who will then compile the requested records at a time convenient to it, good cause exists under Rule 41 to permit the execution of the requested warrant at any time in the day or night.  Further, pursuant to 18 U.S.C.

§ 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## **CONCLUSION**

73.     I submit that this affidavit supports probable cause for a warrant to collect the requested information about the location of the Target Telephone, as described in Attachment A, and to seize the evidence described in Attachment B.

Respectfully submitted,

_____

Sean P. O'Rourke
Special Agent
Federal Bureau of Investigation

Subscribed and sworn by telephone pursuant to
Fed. R. Crim. P. 4.1 and 41(d)(3) on January 30, 2021.

_____

G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE

**Attorney Certification Under 18 U.S.C. §§ 3121-3127**

To ensure technical compliance with 18 U.S.C. §§ 3121-3127, the warrant applied for herein will also function as a pen register order.  I, an attorney for the Government, certify that the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by the Federal Bureau of Investigation.  *See* 18 U.S.C. §§ 3122(b), 3123(b).

John W. Borchert
Assistant United States Attorney
District of Columbia